Good morning, Interim Case Record. My name is John Scott. I'm the attorney for Jennifer Hugh Donovan. And, I'm just like to say I've been a civil rights attorney for 40 years. I've done dozens, and I have a number of deep excessive force cases. And, this is one of the few cases that I can recall ever where somebody's argument was granted on the issue of deep excessive force. Because, at least as I do, my experience has been if I read a lot of the Ninth Circuit published decisions, in rare exceptions, the issue of whether a force is excessive is an issue of fact, when it comes to a juror, you point brain vectors. And, it's a rare situation where a judge doesn't allow that issue to be juried. And, what's striking to me about this case, Jennifer Hugh Donovan, was how often she speaks for the jury. I mean, isn't this case just unique in that there's a video showing pretty much the whole show. It's not that you can blow out a lot of it, but the main issue that would tell us whether or not there was excessive force. Yeah, well, up until the last five or so years, yes, videos were rare. But, if you want to know, it is unique. If you look, what does the video demonstrate? She was standing there with her palms open. She wasn't being aggressive. She wasn't acting aggressive. She was demonstrating some passive resistance. That was very passive. I told her to get back in the car, and she didn't. She stood there passively. Now, under those circumstances, she had violated his specific direction. And, I know that that's whether or not she was aggressive is a factor, but did she not? I mean, he told her. Yes. So, Audrey, please, I'm sorry. You were eating. She was standing next to her friend with her arms around her. She tells you to do something. You don't do it. Under the law, detective, there are also justifications. Wouldn't he have thought he'd been present with you and carried you down and turned his shoulder out? No. You look at the totality of the circumstances. It seems here that he had potentially intoxicated people. Women? Yes, women. Two potentially intoxicated women on the side of the road at, I think, 11 p.m. at night. I think anybody can make an argument that he could have done more, in terms of maybe a little bit more, in terms of trying to maybe perhaps say something more. I don't know, but he did. You know, if you look at the totality, he did tell her, stay in the car, stay in the car, don't come out of the car. It was his. He violated that direct violation. He had somebody, you know, from the other side get out of his car, and then he's now looking at two people and not sure of what would play out. And, Audrey, please, also, you're not sure of what's going to play out in the meeting. And he's even admitted in his deposition, he has made more such stops to provocative officers than he's been stopped to as a provocative officer in all of those situations. The other officer goes on their way. Okay. I think the question was, did she have a substantial interest in securing the witness, and I don't know whether she actually did that, but he did. He could have been. If he wanted to be a bad guy and do not exhibit professional courtesy, all he had to do was say, you are under arrest. Turn around and put your hands behind your back. That's what he's trained to do. He didn't do that. How simple is that? How simple is it to someone you disobeyed my order, you disobeyed my command? You're under arrest. Put your hands behind your back. Turn around. Cover up. Put them in your car. How easy is that? No, he didn't do that. Instead of simply saying, which is what he's trained to do, which is police officer 101 in California. Somebody's broken the law. You're under arrest. What are you trying to do? What is the law requiring? Well, actually, what he was trained to do, I mean if we just even assume that to do this, because the law enforcement is not excessive, what he was trained to do was to do a control hold when you get into those situations. You need to trust that in your breathing. And I'm curious to hear what your response is to addressing that, to talk about the manual that he has been offered up. It's not a control hold. This is someone who is not cooperating in handcuffs. And so he's not cooperating in handcuffs. He's taking control of both of them. A control hold, according to his manual, is when a subject is not responding to verbal commands, but also offers no physical form of resistance. So she's not responding to verbal commands. Or she was responding to physical commands. Have you ever said you're under arrest for doing this behind your back? He never said that. So is he responding to her commands up to that point? He would do that once you're back in the car. Not to get out of the car. Don't get out of the car. Don't get out of the car. So did she get out of the car before you left? And so has she been responding to his direct commands? No, she had been disobeying his command, which gives him a right, if he wants to, if he wants to exercise his discretion and arrest her, on his real simple, you're under duress, put your hands behind your back. His real simple, she's not doing that. She knows the drill. And he's escalating it into a use of force. For one, it's real clear he had passive resistance. And this is passive resistance. Does the police officer have a right to use force? It's not necessary. A button is necessary to arrest someone. This is she first asked questions later. He didn't say to her, he didn't say to her, you're under arrest. He doesn't know a lot of things, but he's quite easy. Get in the car and we're going to arrest you, or you're under arrest. He didn't give you one of those things. He ran up to her and grabbed her and threw her down. And he didn't even tell her. He thinks he may have told her. She was under arrest after he took her down. Did you ever see him any more times? Yes. We were able to link him to a Secretary of Defense. My name is A.C. Carden. Robert Rogoyski for Defendant Apollo Phillips and for the people of the state of California. So we have now heard plaintiff's oral argument. We've seen the plaintiff's opening brief and high brief. And there's something missing. And what's missing is a case that would put every reasonable officer on notice. And Officer Phillips's actions were improper in the Fourth Amendment. We have a plenty of excuses. That's the beauty of force. So in these circumstances, we must bear the presence of confidence in what we're resisting. And I think that's hard to find. And I feel that might be fine. I got one thing that counsel mentioned with this concept of passive resistance. He admitted she was passively resisting. So in the passive resistance context, we cited force, which stands for the proposition that when an individual is passively resisting, force is not appropriate. An officer has discretion to choose between which type of force would be applied. In that case, the officers decided instead of carrying out the individuals, they would use what was known as a war-type police notch, obviously, to apply torque to the individual's arm. But, listen, the problem for your case, as I see it, is that the best case for your client is that he intended to, unless it was done at the point she refused to obey the order, they were taken back into custody. Right. I mean, so the moment that he's rushing out to her, he's intending to arrest her, right? Right. I don't think you have a single case that says when someone is not posing any physical resistance to your intentional rationale. I mean, could you say zero? I'm going to say three years old or something, I think. Actually, we do. In Iberli, so the Iberli case, this was a 9th Circuit case involving a situation, a football stadium, where there were individuals who were engaged in an altercation with the officers in the stadium. But the plaintiff who was really interested in that case, his plaintiff, Kaiser, because in his case, he was not actively resisting. He wasn't even actually engaged in the commission of the crime. He wasn't committing a misdemeanor. And the officer at that point put him in a finger control hold to prevent him from getting anywhere near the scene as part of taking control of a dangerous situation. The Iberli case, a finger control hold, was quite different, I think, from any other force that was used here, because even watching the video, I'm sure you can conclude that not only did your client decide to apply a control hold to what he was doing, trying to control the remarks on the court, but they also attempted to throw him to the ground so that he could get arrested. And that force, that level of force is probably the most common in the Iberli case. It is a level of force that is greater than the Iberli case. In fact, even cases like Arizona v. Johnson and United States v. Williams, a level of danger was seemingly indicated from the officer's perspective. Arizona v. Johnson, Justice Ginsburg writing for you, and his court referred to a traffic stop situation in general, just in general, as being one that is fraught with danger to police, creating a waning interest in officers' safety. This court, the Ninth Circuit in Williams, takes that a step farther and says, in a specific situation, allowing a passenger or passengers to wander freely about while a lone officer conducts a traffic stop presents a dangerous situation. The other difference here, as we looked at back there, was the dangers of the officer or somebody standing there with their hands up. It's easy to say, hey, what's going on? What was the danger posed to Donovan at this time? So there was two kinds of dangers, at least. One was the danger posed by Donovan himself, because from Officer Phelps' perspective, we know it's her and their objective and mission of taking a potential threat. In her case, she is committing a misdemeanor. That was not a misdemeanor. She has disseminated threat orders to go back inside a vehicle. Donovan says, well, she's a police officer and there should be a professional courtesy because she knows the drill. But if she does the drill, I'm asking you when somebody is standing there with their hands up. So he can't say that he thought that she might have a weapon that she was going to use against him. She is not in an aggressive stance on the stage during a personal complaint. She's not verbally challenging him. She's not saying anything that would lead him to believe that she's in any way about to attack him. So why can't you just rush up to her with the co-ordinating and a fine-form and say, somebody needs to stand there and say, hey, what's going on? Well, he knows that she is a trained police officer. He doesn't know that she's not armed. He hasn't been able to make that distinction. Her hands are like this. Can you see it? I'm not doing it by hands. I'm not in any way being physically aggressive to him. I'm not being verbally aggressive to him. I'm just inquiring, what are you doing to my partner over here such that she's calling out my name, trying to figure out, you know, that she needs help. So the distinction between her and just any individual who was doing confiscations, especially in consecuting, there were several cases where he was able to show objective addition of intoxication, which changes the conduct. So these wrong people can just be handled by police with no warning, even when they come to know threat. That's right. No, I wouldn't take it that far. We also can't just, what is the danger that this dominant police is your client at the moment that you rush up to her and throw a kick at her. I was just trying to figure that out because I watched that video probably as many times as you have. Well, so I would say that there's the objective addition that he has no idea what she's going to do. It's the side of the road at night. Potentially intoxicated person. So that's one level. The other level is her interference forced Officer Phillips to abandon his Gaten's priority test with another intoxicated person standing by the side of the road. So she's got all the endanger to herself. She can potentially run away. She can fall into traffic and threaten passing motorists. And the key is not to be sighted. It takes recognition of the fact that when we're dealing with the road that is heavily trafficked, as the panel can see through the video, there's a number of cars going by every 15, 20 seconds or so. That affects the calculus of whether it's a dangerous situation. The other issue here with that is the officer doesn't know if she's going to interfere. He doesn't know if the other person is going to run away. And we see in the video, in fact, the driver of the vehicle does wander away and does suffer a little on the roadside vehicle. But that was an injustice because you have your client in there and he's rushing over for no good reason to try to find somebody who's causing no fuss to him. If he'd be smart, he would have stood by the other car in front of him. But he wouldn't sit there and serve on his hands. So in this time, he'd look, you know, disobey my command, you know, drive around, you know, get you on the ground, crash into the tree as well. I think something that would make it much easier for a review to take her into custody instead is if they wanted to provoke the confrontation and the person who was supposed to be in that position to testify. Well, again, I would go back to Nancy's people, which says that allowing two people to wander about when there's only a single police officer, it creates a dangerous situation in its own right. The other aspect of it is, unlike many of the cases that are cited in the briefs, there's very little time. So he has to walk over and has to start dealing with her, and he has to make a decision very quickly. He's not at a distance of 20 to 25 feet, as we see in some of the cases. He's not supported by other officers. He has to make a quick decision. And as we all recognized during my colleagues' opening argument, we can always come up with some way that the officer could have used less force or been more gentle. But we are in ownership of both, by the way. Sir, go ahead. Thanks, Michael. I was going to ask both of those questions. Let me just ask you, because this is a very interesting question for me, because it seems like the officer most easily could have given him more verbal warnings before arresting her simply by going back to Nancy. As he's repeatedly giving her more warnings, he's taking her down. You know, as soon as you get out of the car, And I'm just wondering, in the light of that and all these factors, can we conclude that an officer's focus, of course, was not excessive as a matter of law? Is this something that we should go to a jury and decide, so that she could have been gentle? So I would say that a reasonable officer, well, I'll say this. Yes, it's a matter of law that this court can make that conclusion, because we are instructed not to engage with 20 to 25 feet. And police officers are supposed to have the range of discretion in order to detect their work. They're not obligated, for instance, to use the lowest possible force on the continuum. So there is an absence of a warning, but that absence of a warning is just one factor in the calculus. It's not just positive. And I would add that even if there is some question on the constitutional issue, we still haven't seen the case that would put his actions beyond debate. So if we feel like there is some debate to be had, there's some question remaining. And that is, we might say that based on the case law, there is some room for debate. I think qualified immunity applies. My colleague on the other side said that, you know, in dozens of these cases, you usually go to a jury, because they're receiving their second judgment. It's granted. But qualified immunity is a immunity for suit, and it's intended to be resolved prior to trial. So if we don't have an appropriate case law that's dispositive, qualified immunity has to apply. Right. Your claim tended to justify the level of enforcement abuse, rather than the fact that they can use deposition by saying that you interpreted Ms. Gomez as having adopted a warning stance, which is one of the level of enforcement I'm concerned with, taking it up to discipline rate. Right. And again, I guess I found that to be a debatable proposition that we wanted to debate. But I guess I wonder why wouldn't a jury be able to make its own assessment as to whether, in fact, Ms. Gomez had to interpret Ms. Gomez's substantive status. I mean, that's what I remember your client saying, is that the justification for what she thought, according to you, Tom, was important to you, because you felt that he was under an injury, because she could interpret this in a different way. That's right. I just felt that it was, well, maybe, but if a researcher could easily conclude that his stance was just an obscene one, what's wrong with it? Well, to respond to that, I would say that the district court resolved that factual dispute in favor of plaintiff's sentence, and along with it, one other factual dispute, and looked at the totality of the circumstances and said, notwithstanding that resolution in plaintiff's favor, no reasonable jury could conclude that this level of force was improper under these circumstances. And that even if that is wrong, there is no clearly established right to be free from force under these circumstances. All right. I know further questions. All right. That's good. Thank you. Is there a snap? No. Just a time of brief, and then I'd like to remind the court that in the case we decided, the required brief called Nelson v. City of Davis, and that's up in case 2012, 685-3867. And that case was a past business case. The court noted in that case that, taking back to 2001, this went well established in the Ninth Circuit, but a failure to fully or immediately comply with the officer's order neither rises to the level of active resistance nor justifies the application of a non-trivial amendment of force. And I submit that, based on the Nelson case, the issue that was raised in the call for an amendment was clearly established as of 2001, if I'm correct. Thanks a lot. Thank you. Thank you very much. Thank you all for your very helpful arguments in this case. Thank you. Thank you. Mr. Scott, Mr. Olkowski, we appreciate it. So in the case of Naga v. Horses, as Nelson did,
judges: Fernandez, Murguia, Watford